IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
ABILENE DIVISION

JOHN NOLES,                          §
Institutional ID No. 02163071,       §
                                     §
            Plaintiff,               §
                                     §
v.                                   §    Civil Action No. 1:22-CV-00198-BU[1]
                                     §
AKWITTI, *et al.*,                   §
                                     §
            Defendants.              §
                                     §

**FINDINGS, CONCLUSIONS, AND RECOMMENDATIONS
OF THE UNITED STATES MAGISTRATE JUDGE**

Plaintiff Mark Anthony Noles, an inmate incarcerated by the Texas Department of Criminal Justice (TDCJ), brings this conditions-of-confinement claim under 42 U.S.C. § 1983 against Warden Chimdi Akwitti and Assistant Warden Phillip McCain. *See* Dkt. No. 23. Defendants now bring a Motion for Summary Judgment asserting qualified immunity. Dkt. No. 37.

For the reasons below, the undersigned RECOMMENDS that the Court GRANT Defendants' Motion.

## I.    JURISDICTION

Noles brings this action under 42 U.S.C. § 1983, providing the Court with subject-matter jurisdiction under 28 U.S.C. §§ 1331, 1343(a)(3). Venue is proper in the Northern

---

[1] This case was stayed and administratively closed, then reopened and the stay lifted on November 22, 2024. Dkt. No. 30.

1

District of Texas, Abilene Division, because the events giving rise to Noles's claims occurred at TDCJ's John Middleton Unit in Jones County, Texas. *See* Dkt. No. 1. The undersigned has the authority to enter these Findings, Conclusions, and Recommendations after United States District Court Judge James Wesley Hendrix transferred this case to the undersigned for preliminary screening. Dkt. No. 9; 28 U.S.C. § 636(b)(1)(B).

## II.    FACTUAL BACKGROUND

As alleged, Noles and 150–220 other inmates were required to sleep on the floor of the gym while at the Middleton Unit. Dkt. No. 1 at 6. Noles is one of at least eleven "gym floor" plaintiffs who allege similar facts. Dkt. No. 23 at 2. Through the Court's review of the gym-floor cases, the Court learned that inmates were likely assigned to the gym according to an overarching policy of placing inmates with heat restrictions in air-conditioned housing. *Id*. at 3 fn 4. Each plaintiff, including Noles, appears to have had a heat restriction based on a medical condition, a mental health condition, or a prescribed medication, and the gym at the Middleton Unit had air conditioning.[2] *Id*.

Noles arrived at the Middleton Unit on September 30, 2022, and remained there until his transfer to the Lindsey Unit on November 14, 2022. Dkt. No. 31 at 9. Defendants allege he was placed in the gym because "Noles is prescribed medications that affect his ability to withstand heat stress, specifically, medications for a psychiatric condition, seizures, and hypertension." Dkt. No. 38 at 9. On Noles's first day on the gym floor, clinic notes reflect a "Bunk Assignment Lower Only" in affect since August 2, 2018. Dkt. No.

---

[2] It is not clear from the record whether other parts of the Middleton Unit also had air conditioning at the time.

39-1 at 23. Five days later, medical staff at Middleton saw Noles for his intake interview. *Id*. at 148. The intake notes Noles's chief medical complaints as hypertension, hyperlipidemia, asthma, seizures, and limited range of movement in his left shoulder from a motor vehicle accident in 2020. *Id*. at 149 ("Had MVA in 2020- left shoulder limited ROM."). The intake also specifically notes "left shoulder pain and limited ROM." *Id*. Despite these documented medical issues and restrictions, Noles was initially required to sleep directly on the floor with just a blanket for a week and a half before being provided with a mattress on the floor. Dkt. No. 31 at 6–9.

Noles and the other gym-floor plaintiffs do not complain simply about sleeping on the floor. This condition was exacerbated by several others. For instance, Noles alleges the rat infestation was so bad that rats crawled over him and his blankets while he was sleeping. Dkt. No. 1 at 6. Noles saw rats "pretty much every night" and on one occasion he "had one under the blanket with [him]." Dkt. No. 31 at 25. There was also rat feces "[a]ll over the gym floor." *Id*. at 26. The huge "sewer rats" were also "in the [food] warmers and they actually literally stole the food off the trays." *Id*. at 37 (cleaned up). Noles alleges that "[t]here would be rats on the cornbread, and all [the chow hall staff] would do is brush it off and feed it to [the inmates]." *Id*. at 26.

Noles also alleges plumbing and bathroom issues. Approximately 200 inmates shared only two toilets. *Id*. at 17–18. Sometimes both toilets worked, sometimes only one worked, and other times there were no functioning toilets at all. *Id*. During those times, inmates were forced to defecate on top of several layers of other inmates's feces. *Id*. Noles also explains that a pipe stuck out of the floor and spewed raw sewage out of the bathroom

3

and into the sleeping area. *Id.*

Noles also makes overcrowding allegations stating that with around 200 inmates, there was "no space to move around." *Id.* at 5. His mattress assignment on the floor was "literally probably about a foot and a half from the next person." *Id.* at 10. Because of the overcrowding, Noles describes the gym as "pretty rowdy" and describes several fights between inmates or involving officers, although he himself was never assaulted. Dkt. No. 10, 27. But presumably every time an officer used OC spray to break up a fight, all the inmates in the gym suffered from not having gas masks. *See* Dkt. No. 14 at 3 ("Yes, [that adequately describes all of my complaints], except for us getting gassed with OC spray.").

Lastly, Noles alleges inadequate showers. The gym did not have dedicated shower facilities, which meant Noles had to walk an eighth of a mile outside to the Unit's intake building to take a "freezing shower." Dkt. Nos. 31 at 31; 1 at 6. Moreover, these "freezing showers" occurred during the winter months when it was 30 degrees outside. Dkt. No. 31 at 30. And sometimes Noles "got showers every day", but sometimes "it would take a week". Dkt. No. 31 at 31. Whenever it took a while, he and other inmates opted to take "showers" in the mop closet in the gym. *Id.* at 15, 31.

Noles saw Akwitti twice during his stay at the gym. *Id.* at 10. Akwitti normally only visited when he was called in to review a use of force incident. *Id.* at 10–11. Although the conditions were visually apparent, including sewage all over the floor, Noles personally told Akwitti about the situation with the toilets and showers. *Id.* at 15. Akwitti would respond with "we're working on it" and walk away. *Id.* at 28. Akwitti was not one to engage in conversation. *Id.*

McCain visited more often, around 8–10 times, also usually after use of force incidents or to "look around and do nothing." Dkt. Nos. 14 at 2; 31 at 11. McCain would laugh when he entered the gym, making Noles feel like McCain thought the horrible conditions were a joke to him. Dkt. No. 31 at 18. When inmates would ask him about when they would get out of the gym, McCain would respond with "we're working on it." *Id*. And when inmates would ask him about getting the toilets fixed, McCain would respond with— "I got you, dude. They'll be down here today."—but maintenance wouldn't come until a week later. *Id*. at 17. Noles's impression was that McCain was trying to take care of the conditions, but they never got taken care of. *Id*. at 12.

Despite these interactions with the wardens, the conditions never improved during the 45 days Noles was housed on the gym floor. Dkt. No. 14 at 3–4.

Noles brings this §1983 claim against Defendants in their individual capacity seeking money damages. Dkt. No. 23 at 15 (dismissing all other claims). Noles seeks $35,000 in punitive damages against each Defendant. Dkt. No. 1 at 4. Noles did not respond to Defendants' assertion of qualified immunity.

### III.    LEGAL STANDARDS

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine dispute of material fact exists if a reasonable jury could enter a verdict for the non-moving party." *Doe v. Edgewood Indep. Sch. Dist.*, 964 F.3d 351, 358 (5th Cir. 2020). Typically, the moving party "bears the initial responsibility of . . . demonstrat[ing] the absence of a genuine issue of material fact." *Jones v. United States*,

936 F.3d 318, 321 (5th Cir. 2019) (cleaned up). The moving party may "identify those portions of [the record] which it believes demonstrate [that] absence." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

But when a summary judgment movant asserts a qualified immunity defense, that assertion "alters the usual summary judgment burden of proof." *Brown v. Callahan,* 623 F.3d 249, 253 (5th Cir. 2010). Movants have no burden "to put forth evidence to meet [their] summary judgment burden for a claim of immunity" and need only assert the defense in good faith. *Beck v. Tex. State Bd. of Dental Examiners*, 204 F.3d 629, 633 (5th Cir. 2000). "[O]nce properly raised by the defendant, the plaintiff has the burden to negate the assertion of qualified immunity." *King v. Handorf*, 821 F.3d 650, 653 (5th Cir. 2016) (citation and internal quotation marks omitted). This means the plaintiff "must show: (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Cass v. City of Abilene*, 814 F.3d 721, 728 (5th Cir. 2016) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011)).

In deciding whether a plaintiff has shown a violation of a protected right, courts consider the facts alleged in the light most favorable to the plaintiff. *Saucier v. Katz*, 533 U.S. 194, 200 (2001), *overruled in part by Pearson v. Callahan*, 555 U.S. 223 (2009). But "a party cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, 'or only a scintilla of evidence.'" *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (per curiam)). The plaintiff must identify specific evidence in the record and show how it presents a genuine issue of material fact for trial. *Celotex*, 477 U.S.

6

at 324; *see also RSR Corp. v. Int'l Ins. Co.*, 612 F.3d 851, 857 (5th Cir. 2010). Furthermore, "[t]he court has no duty to search the record for material fact issues." *RSR Corp.*, 612 F.3d at 857; *see also Hernandez v. Yellow Transp., Inc.*, 670 F.3d 644, 651 (5th Cir. 2012) ("If somewhere in a record there is evidence that might show a dispute of material fact, the district court needs to be pointed to that evidence as opposed to having to engage in an extensive search.").

"Qualified immunity shields government officials from liability when they are acting within their discretionary authority and their conduct does not violate clearly established statutory or constitutional law of which a reasonable person would have known." *Gates v. Texas Dep't of Protective & Regulatory Servs.*, 537 F.3d 404, 418 (5th Cir. 2008) (citations omitted). The doctrine protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

## IV.    ANALYSIS

To overcome Defendants' assertion of qualified immunity on summary judgment, Noles must show the existence of a fact issue on each of the following: (1) objectively, Defendants exposed him to a substantial risk of serious harm by denying him the minimal measure of life's necessities; (2) subjectively, Defendants were deliberately indifferent to the risk; (3) the law was clearly established that Noles had a constitutional right to be free from the alleged conditions; and (4) in light of clearly established law Defendants conduct was objectively unreasonable.

The first and second elements relate to the first prong of the qualified immunity analysis—the existence of a constitutional violation. The third and fourth elements relate

7

to the second prong of the analysis—a clearly established right. The undersigned will address each element in turn.

Noles did not produce any evidence in response to Defendants' Motion. However, the Court may consider Noles's verified allegations—including the complaint, response to the magistrate judge's questionnaire, and testimony at Noles's *Spears* hearing—as competent summary judgment evidence. *See Hart v. Hairston*, 343 F.3d 762, 765 (5th Cir. 2003). Furthermore, at this stage, the Court must "accept the plaintiff's version of the facts (to the extent reflected by proper summary judgment evidence) as true." *Haggerty v. Tex. S. Univ.*, 391 F.3d 653, 655 (5th Cir. 2004).

### 1.  The First Prong: A Constitutional Violation

#### a.  Eighth Amendment Conditions-of-Confinement Claims

The Eighth Amendment prohibits "cruel and unusual punishments," U.S. Const. amend. VIII, and "[t]he treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." *Gates v. Cook*, 376 F.3d 323, 332 (5th Cir. 2004). While the Constitution does not mandate comfortable prisons, it does not permit inhumane ones. *Rhodes* v. *Chapman*, 452 U.S. 337, 349 (1981); *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). An Eighth Amendment violation occurs when prison conditions pose an unreasonable risk of serious damage to a prisoner's health—an objective test—and prison officials act with deliberate indifference to the risk posed—a subjective test. *Garrett v. Lumpkin*, 96 F.4th 896, 900 (5th Cir. 2024).

The objective component also requires showing that the conditions were objectively "sufficiently serious" or "extreme." *Farmer*, 511 U.S. at 834 (citation omitted) (first

quote); *Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (second quote). The deprivation must involve a basic human need—such as food, clothing, medical care, and safe and sanitary living conditions—and must deny the inmate of the minimal civilized measure of life's necessities. *Hope v. Harris*, 861 F. App'x 571, 582 (5th Cir. 2021); *Chapman*, 452 U.S. at 347–49. The conditions are measured against the standards of decency that mark the progress of a maturing society. *Chapman*, 452 U.S. at 346–48.

For the objective component, the Court must examine the totality of the circumstances. *Id*. at 363–64. Even if no single condition of confinement alone would be unconstitutional, exposure to multiple conditions may subject inmates to cruel and unusual punishment when they have a "mutually enforcing effect" that produces the deprivation of a single, identifiable human need, such as food, warmth, or exercise. *Wilson v. Seiter*, 501 U.S. 294, 304 (1991) (explaining that there may be an Eighth Amendment violation where a prisoner complained of a "low cell temperature at night combined with a failure to issue blankets").

The subjective component requires proof that the prison official acted with deliberate indifference to inmate health or safety. *Farmer*, 511 U.S. at 834 (to violate the Cruel and Unusual Punishments Clause, a prison official must have a sufficiently culpable state of mind). The standard is not met merely from a negligent or even a grossly negligent response to a substantial risk of serious harm. *Dyer v. Houston*, 964 F.3d 374, 381 (5th Cir. 2020).

Therefore, the inmate must show that prison officials were: (1) "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists"; (2)

"subjectively drew the inference that the risk existed"; and (3) "disregarded the risk." *Cleveland v. Bell*, 938 F.3d 672, 676 (5th Cir. 2019) (citing *Farmer*, 511 U.S. at 837) (alterations omitted). More simply, the prison officials must know of, and disregard, an excessive risk to a prisoner's health or safety. *See id.* (citation omitted). Under exceptional circumstances, a prison official's knowledge of a substantial risk of harm may be inferred by the obviousness of a substantial risk. *Bradley v. Puckett*, 157 F.3d 1022, 1025 (5th Cir. 1998).

   b.   Objective Component

Noles contends that he was forced to: (1) sleep on the floor; (2) including for a week and a half with no mattress; (3) in a rat-infested gym; (4) with only two toilets that frequently backed up; (5) that spewed raw sewage into the gym; (6) with inadequate showers; and (7) in a an environment that was overcrowded with 150–220 inmates sleeping a foot and a half from each other and frequently physically fighting, all of which constitutes cruel and unusual punishment. Dkt. No. 31 at 6–10, 17–18, 25–26, 30–31. He adds that these conditions were exacerbated by his documented medical conditions and the length of time he was forced to endure the conditions. *See generally* Dkt. No. 31.

   i.   *The gym conditions*

The existence of the alleged conditions is undisputed. Defendants instead contend that the conditions did not operate with a mutually enforcing effect that deprived Noles of sleep, food, hygiene, or any other identifiable human need. Dkt. No. 38 at 15–19. Their argument, however, rests almost entirely on cases holding that each condition, considered

in isolation, does not amount to an Eighth Amendment violation.[3] *Id*. The undersigned agrees with Defendants to that limited extent: there is little, if any, caselaw supporting the proposition that any of the alleged conditions, standing alone, constituted a constitutional violation.

But a court evaluating a conditions-of-confinement claim must consider the totality of the circumstances a prisoner was forced to endure. *Chapman*, 452 U.S. at 363–64. Although Defendants purport to do this, by analyzing the mutually enforcing effect of the conditions, they draw too much of their support from cases that involve only one condition—such as the lack of a mattress, or the presence of rats—rather than looking at cases where multiple conditions interacted together to cause a deprivation. Defendants also fail to consider whether the conditions—viewed not only collectively, but also over time and in light of the inmate's health—had a mutually enforcing effect sufficient to create a constitutional deprivation.

Given the conditions themselves are undisputed, the undersigned turns next to

---

[3] *Mann v. Smith*, 796 F.2d 79, 85 (5th Cir. 1986) ("Mann has cited no case holding that the Constitution requires elevated beds for prisoners, and we know of no source for such a right."); *Conlin v. Thaler*, 347 F. App'x 983, *1 (5th Cir. 2009) (finding that an inmate's claim that his sleeping mat is uncomfortable and caused him to lose sleep does not allege a constitutional violation); *Gaines v. McDonald*, No. 3:12cv404-JMR, 2013 U.S. Dist. LEXIS 117105, at *11 (S.D. Miss. Aug. 19, 2013) ("Detainees have no right to an elevated bed."); *Elliott v. Cerliano*, No. 6:20-CV-00446, 2022 WL 2496200 (E.D. Tex. July 6, 2022) (presence of pests, without more, does not amount to a constitutional violation); *Garcia-Perez v. Guerra*, No. 7:22-CV-130, 2024 U.S. Dist. LEXIS 27452, at *19–21 (S.D. Tex. Jan. 17, 2024), *report and recommendation adopted*, 2024 U.S. Dist. LEXIS 26387 (S.D. Tex., Feb. 15, 2024) (gnats living on the surface of toilet and apparent mold on showers and ceilings fail to state a claim of unconstitutional conditions of confinement); *Green v. Ferrell*, 801 F.2d 765, 770–771 (5th Cir. 1981) (explaining that even on a regular, permanent basis, two meals a day may be adequate); *Talib v. Gilley*, 138 F.3d 211, 214 n.3 (5th Cir. 1998) (expressing doubt that an inmate who missed 50 meals in five months and lost 15 lbs. established a constitutional violation); *Lett v. La Salle Sw. Corr.*, No. 3:21-cv-02257-S (BT), 2023 U.S. Dist. LEXIS 194118 (N.D. Tex. Sep. 7, 2023) ("only in extreme circumstances do unsanitary conditions rise to the level of a constitutional deprivation").

Noles's preexisting medical conditions before turning to the duration of his exposure to harm.

### ii.    Noles's medical conditions

Defendants acknowledge that Noles was assigned to the gym floor due to his prescribed medications for a psychiatric condition, seizures, and hypertension, which affect his ability to withstand heat stress. Dkt. No. 38 at 9. But Defendants do not elaborate on the process or criteria used in making the gym floor assignments, the reason floor assignments in the gym were necessary in the first place, or how long the wardens expected floor assignments to last once they were implemented. These questions cannot be answered on this record.

Several observations within the medical record provide insight into whether the gym-floor conditions—objectively—posed an unreasonable *risk* of serious damage to Noles's health. For example, five days after being assigned a spot on the gym floor, Middleton's intake exam reflected Noles's chief medical complaints as hypertension, hyperlipidemia, asthma, seizures, and limited range of movement in his left shoulder from a motor vehicle accident in 2020. Dkt. No. 39-1 at 149 ("Had MVA in 2020- left shoulder limited ROM."). The intake also specifically notes "left shoulder pain and limited ROM." *Id*.

Further, Noles's records reflect a "Bunk Assignment Lower Only" restriction since 2018. *Id*. at 23. And yet Noles was assigned to sleep on the gym floor despite even his lower-bunk restriction, the supposed purpose of which is to make getting in and out of bed easier. In that respect, the floor is no better than an upper bunk. But notwithstanding this

12

restriction and the intake notations of left shoulder pain with limited range of movement, Noles was assigned a spot on the gym floor; initially sleeping directly on the floor with just a blanket for a week and a half before being provided with a mattress. Dkt. No. 31 at 7.

All to say, the *existence* of Noles's medical conditions—some of which reasonably would have counseled against a floor assignment—does not appear to be disputed and are part of the totality of circumstances the Court, and a reasonable jury, should consider in assessing whether Noles was objectively exposed to a substantial risk of serious harm.

### iii.    Duration of Noles's exposure to conditions

Generally, extremely egregious conditions, even for a short duration, can give rise to an Eighth Amendment claim. *See Taylor v. Riojas*, 592 U.S. 7, 52–54 (2020) (filthy cell with massive amounts of feces, four days; then frigid cell with clogged drain and no clothes, two days). The calculus obviously runs in the other direction, as well—less egregious conditions can become a constitutional violation if a prisoner is forced to endure them for a long time. *See Hutto v. Finney*, 437 U.S. 678, 686–87 (1978) (holding that "the length of confinement cannot be ignored in deciding whether the confinement meets constitutional standards" and observing that "[a] filthy, overcrowded cell and a diet of 'grue' might be tolerable for a few days and intolerably cruel for weeks or months").

Defendants do not dispute that Noles was assigned a spot on the gym floor for his entire 45-day stay at Middleton. They also do not dispute that the conditions never improved during his stay. That Noles endured these conditions for 45 days is particularly concerning. As the *Hutto* court observed, the length of confinement cannot be ignored in deciding whether the confinement meets constitutional standards. 437 U.S. at 686–87.

Here, considering the facts in a light most favorable to Noles, a reasonable jury could find that he was exposed to the combined conditions for 45 days and that this duration aggravated the severity of the overall deprivation. *Harris*, 861 F. App'x at 586 (Haynes J., concurring in part). Ultimately, the combined conditions "might have been tolerable for a few days" but a reasonable jury could find that they became "intolerably cruel" when endured for 45 days. *See Hutto*, 437 U.S. at 686–87. It must also be remembered that the sole reason Noles and the other inmates were in the gym was because TDCJ recognized they were medically unable to endure the heat.

       *iv.*    *Mutually enforcing effect of conditions*

The summary judgment evidence fails to resolve genuine factual disputes about whether the combined conditions—rats, no mattress for a week and a half, no bunk or cot, overcrowding, backed up plumbing, infrequent cold showers—had a mutually enforcing effect of objectively depriving Noles of the basic human need of safe and sanitary living conditions. As discussed, the Court must further consider these combined conditions in the context of: (a) Noles's medical conditions when assigned to the gym; and (b) the duration of Noles's exposure to the gym conditions. *Harris*, 861 F. App'x at 582. Noles's verified pleadings provide more than a scintilla of evidence from which a reasonable jury could resolve these issues in his favor, and Defendants have failed to sufficiently rebut these claims to remove them from the province of a jury.

    c.  <u>Subjective Component</u>

Having determined that fact issues exist as to whether Noles was objectively exposed to a substantial risk of serious harm, the undersigned turns now to whether Noles

14

can show genuine disputes on whether each warden acted with deliberate indifference to that risk.[4] *See Farmer*, 511 U.S. at 834. The undersigned begins with Akwitti.

### i.    Warden Akwitti's subjective indifference

Noles asserts that Akwitti was directly aware of the conditions in the gym. According to Noles, he saw Akwitti in the gym on two occasions and "personally told him about the toilets and the showers and stuff like that." Dkt. No. 31 at 10, 15. Akwitti would respond with something along the lines of "we're working on it." *Id*. at 28. Noles also contends that Akwitti knew about the conditions because each time he visited, the conditions were apparent and obvious. *Id*. at 15 ("He knew about the conditions, do you know what I'm saying, that the toilets were backing up, and he could see the sewage all over the floor. So I mean I know he knew about it.") (cleaned up).

Combined with Noles's allegation that the conditions never improved, the verified pleadings could reasonably support a finding that Akwitti personally visited the gym on at least two occasions and was fully aware of whatever conditions existed. On this, there is no genuine dispute. Common sense also dictates that, even on Defendants' version of the facts, the warden would have not only known of the conditions, but also would have made or approved the decision to house inmates in the gym and established the criteria for such assignments.

It is also undisputed that Akwitti understood the medical vulnerability of the inmates

---

[4] The court must address the actions of each warden individually to determine whether qualified immunity applies. *Cass*, 844 F.3d at 730-31; *Meadours v. Ermel*, 483 F.3d 417, 421-22 (5th Cir. 2007); *Stewart v. Murphy*, 174 F.3d 530, 537 (5th Cir. 1999).

assigned to the gym. Defendants admit that because of Noles's prescription medications causing a heat sensibility, he was assigned to the gym floor. Dkt. No. 38 at 9. In other words, inmates were assigned to the gym precisely because they had medical or mental health conditions and were being treated for the same. It is reasonable to infer that Akwitti further knew that those housed there, including Noles, faced heightened medical risks if confined under other adverse conditions, including those that were unsanitary, overcrowded, unsafe, or otherwise unhealthy.

The duration of Noles's stay further strengthens the inference of deliberate indifference. A reasonable jury could conclude that Akwitti had ample opportunity during those 45 days to observe and correct the conditions. In other words, this was not a situation requiring split-second decision-making or an emergency response where qualified immunity typically affords officers the benefit of the doubt. *See Villarreal v. City of Laredo*, 134 F.4th 273, 284 (5th Cir. 2025) (Oldham, J., concurring). The longer Noles was in the gym, the more likely it was that Akwitti was both aware of the conditions and had time to effectively abate them, including by relocating the inmates, providing cots, stepping up maintenance and pest control, or other measures, but instead disregarded the risk. *Harris*, 861 F. App'x at 586 (Haynes J., concurring in part).

Defendants advance one principal argument here: Akwitti "took reasonable measures to abate pests and repair amenities, and therefore were not deliberately indifferent to such risk." Dkt. No. 38 at 19. But as Defendants note, those measures must be reasonable. *Farmer*, 511 U.S. at 847 ("[A] prison official may be held liable under the Eighth Amendment for denying humane conditions of confinement only if he knows that

16

inmates face a substantial risk of serious harm and disregards that risk by failing to take *reasonable* measures to abate it.") (emphasis added). A reasonable jury could conclude that even repeated attempts to resolve a condition when officials know the attempts are inadequate are overall unreasonable.

Further to this point, Defendants fail to provide context from which the Court can determine whether these remedial actions were reasonable. Akwitti claims that between March 3, 2022, and November 8, 2022, maintenance addressed gym plumbing issues 18 times and that between September 2022 and December 2022 pest control was brought in 5 times. Dkt. No. 38 at 20. But the reasonableness of making 18 plumbing repairs in eight months can only be assessed after knowing how many plumbing repairs were in fact needed during that same time. The record is silent on that fact. If the toilets, urinals, and sinks were in a constant state of disrepair despite intermittent fixes—not an unreasonable inference in a confined space with 150–220 inmates—that might reflect on the reasonableness of 18 repairs over eight months. Same with pest control. If there was an intractable rat infestation in a gym where 150–220 inmates were forced to sleep on the floor—which also has support in the summary judgment evidence—then are five pest control treatments reasonable?[5]

Given the variables involved, the answers to these questions are difficult to resolve

---

[5] Several entries in the records tend to corroborate Noles's assertions that the gym was infested with rats and other sanitation issues. For instance, one pest report notes that the "kitchen was very dirty, with lots of food everywhere, trash all over the place, water standing on the ground, and lots of rats seen taking food from the floor." Dkt. No. 39-1 at 240 (cleaned up). Another states, "Rodent droppings in food services, dry storage, commissary, and medical. Units all dirty. Housing areas need to clean around trash cans." *Id*. at 242 (cleaned up). Another states, "Water on ground in kitchen. Horrible smell. Removed a dead rat from kitchen." *Id*. at 239. Another states, "Kitchen needs cleaning. Water and food on ground. All housing areas needs to be cleaned." *Id*. at 238. And yet another states, "Dirty and wet. Food all over ground. Food swept into piles. Trash laying around." *Id*. at 243 (cleaned up).

on this record. This is partly because the alleged conditions are by their nature fact intensive. But it is also because the maintenance and pest control records in the summary judgment evidence are of little help. For instance, the undersigned can only find 16 instances of gym plumbing repairs between March and November 2022, and four of those were made to the officers' restroom in the gym. *See* Dkt. No. 39-1 at 180–234. Of the remaining 12 repairs to the inmate portion of the gym, only three of those were made during the time Noles might have been assigned to the gym. And all three were made on the same day, November 9, 2022. *Id*. at 207. While it is possible that three plumbing repairs on a single day were a reasonable response to the gym's plumbing problems during the 45 days Noles was at the Middleton Unit, the summary judgment record does not help answer that question, and a reasonable jury might regard that response as unreasonable.

The records provided by Defendants on pest control are even less helpful. Defendants argue that "Pest Control Records show that on September 9, 2022, October 12, 2022, November 1, 2022, December 5, 2022, and December 7, 2022, pest control was brought in to apply pest control measures." Dkt. No. 38 at 20. Again, context is important. The record supports that pest control services visited the Middleton Unit five times from September through December. Dkt. No. 39-1 at 237–44. But the record only supports that the gym was treated on one of those occasions, on September 6. *Id*. at 240.

The summary judgment evidence establishes that Akwitti took some remedial measures over several months in response to the conditions in the gym, and elsewhere. The evidence further establishes that the measures that were taken were themselves reasonable. But the Fifth Circuit has held that taking some reasonable measures does not mean an

18

officer, on the whole, behaved reasonably. *Converse v. City of Kemah*, 961 F.3d 771, 779 (5th Cir. 2020) (citing *Jacobs v. West Feliciana Sheriff's Dep't*, 228 F.3d 388, 395–96 (5th Cir. 2000)). A reasonable jury could find that despite Akwitti taking some reasonable steps, his overall response to the prolonged conditions in the gym was not, on the whole, reasonable. And that it may not have been, on the whole, reasonable to address only some of the conditions—rats and plumbing—while ignoring some of the more dangerous conditions that posed a substantial risk to Noles's health and safety—sleeping on the floor and overcrowding.

Thus, based on the summary judgment evidence, a reasonable jury could find: (1) Akwitti was aware that a large number of inmates, including Noles, were assigned to the gym, and that Akwitti likely made that decision; (2) due to the inmates having either a medical or mental health condition or treatment; (3) Akwitti was aware of the adverse conditions in the gym; (4) Akwitti was aware the conditions persisted for months despite remedial measures being taken; and (5) that more remedial measures were within his control to make, but he did not make them. The summary judgment evidence is sufficient to create genuine disputes of material fact as to whether Akwitti acted with deliberate indifference.

### ii. *Assistant Warden McCain's subjective indifference*

Turning now to Assistant Warden McCain, Noles alleges McCain visited the gym around 8–10 times. Dkt. No. 14 at 2. McCain's visits were usually in response to use of force incidents that broke out in the gym. Dkt. No. 31 at 11. According to Noles, McCain would laugh when he entered the gym, making Noles feel like McCain thought the horrible

19

conditions were a joke to him. *Id*. at 18. When inmates would ask him about when they would get out of the gym, McCain would respond with "we're working on it." *Id*. Noles's impression was that McCain was trying to take care of the conditions, but they never got taken care of. *Id*. at 12.

The record of remedial measures is a two-edged sword. Yes, they are evidence of attempts to address the problems, but they are also necessarily evidence of awareness of the problems. Further, if a reasonable jury finds the conditions existed as Noles claims, which it could, the same jury could find that those conditions would have been readily apparent to McCain during his visits to the gym. Not to mention it seems in McCain's Motion for Summary Judgment and his sworn declaration that he admits to the presence of most, if not all, of the conditions Noles complains of.

Moreover, viewing the facts in the light most favorable to Noles, it is reasonable to infer that McCain was privy to the same baseline knowledge as Warden Akwitti: that medically vulnerable inmates were housed on the gym floor for an extended time under debased conditions which were not effectively addressed through, what appears to be, routine maintenance and pest control.

A reasonable jury could find that despite McCain taking some reasonable steps, his overall response to the prolonged conditions in the gym was not, on the whole, reasonable. Thus, as with Akwitti, a reasonable jury could find: (1) McCain was aware that a large number of inmates, including Noles, were assigned to the gym, and that McCain was likely involved in that decision as assistant warden; (2) due to the inmates having either a medical or mental health condition or treatment; (3) McCain was aware of the adverse conditions

in the gym; (4) McCain was aware the conditions persisted weeks if not months despite remedial measures being taken; and (5) that more remedial measures were within his control to make, but he did not make them. The summary judgment evidence is sufficient to create genuine disputes of material fact as to whether McCain acted with deliberate indifference.

### 2. The Second Prong: Clearly Established

Finding that a jury could resolve the first prong in Noles's favor, the undersigned turns now to whether Noles's right to be free from those conditions was clearly established. This second prong involves "two separate inquiries: whether the allegedly violated constitutional rights were clearly established at the time of the incident; and, if so, whether the conduct of the defendants was objectively unreasonable in the light of that then clearly established law." *Hare v. City of Corinth*, 135 F.3d 320, 326 (5th Cir. 1998). Because the undersigned finds that the law was not clearly established, the undersigned does not discuss whether Defendants' conduct was objectively unreasonable.

Defendants urge that even assuming arguendo that the Court finds sufficient evidence of a constitutional violation, "Noles has not met his burden to identify a case in which an officer acting under similar circumstances was held to violate the Constitution." Dkt. No. 38 at 21. They continue, "the variety of cases required to analyze Noles' claims suggests that there is no such case squarely governing the facts as alleged by Noles" and that the facts do not satisfy the "sky high" standard for obviousness. *Id*. at 22. The undersigned agrees.

"To be clearly established, a right must be sufficiently clear that every reasonable

21

official would have understood that what he is doing violates that right." *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (internal quotation marks and modifications omitted). Even if an official's conduct violated a clearly established constitutional right, the official is nonetheless entitled to qualified immunity if his conduct was objectively reasonable under the circumstances. *See Jones v. Collins*, 132 F.3d 1048, 1052 (5th Cir. 1998).

"There are two ways to demonstrate clearly established law." *Batyukova v. Doege*, 994 F.3d 717, 726 (5th Cir. 2021). First, the plaintiff may identify a case—usually, a body of relevant case law—in which an officer acting under similar circumstances . . . was held to have violated the [Constitution]. *Joseph v. Bartlett*, 981 F.3d 319, 330 (5th Cir. 2020) (quoting *District of Columbia v. Wesby*, 583 U.S. 48, 63–64 (2018)) (internal quotation marks omitted). This first approach "do[es] not require a case directly on point[.]" *Batyukova*, 994 F.3d at 726. But the existence of the right must be "sufficiently clear" that every reasonable officer would have understood the challenged condut to have been unlawful. *Id*. (citing *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (internal quotation marks omitted). In other words, "'[t]he central concept is that of "fair warning": The law can be clearly established 'despite notable factual distinctions between the precedents relied on and the cases then before the Court, so long as the prior decisions gave reasonable warnings that the conduct at issue violated constitutional rights.'"" *Trammell v. Fruge*, 868 F.3d 332, 339 (5th Cir. 2017) (quoting *Ramirez v. Martinez*, 716 F.3d 369, 379 (5th Cir. 2013) (quoting, in turn, *Kinney v. Weaver*, 367 F.3d 337, 350 (5th Cir. 2004) (en banc))).

As the Fifth Circuit has explained:

22

> Rights are "clearly established" when "existing precedent 'squarely governs' the specific facts at issue," *Kisela v. Hughes*, 584 U.S.100, 104–05, 138 S. Ct. 1148, 1153, 200 L.Ed.2d 449 (2018) (per curiam) (quoting *Mullenix v. Luna*, 577 U.S. 7, 15, 136 S. Ct. 305, 193 L.E.2d 255 (2015) (per curiam)), *not* when a rule is merely "suggested by then-existing precedent," *City of Tahlequah v. Bond*, 595 U.S.9, 12, 142 S. Ct. 9, 11, 211 L.Ed.2d 170 (2021) (per curiam). The Supreme Court recently . . . reminded lower courts "not to define clearly established law at too high a level of generality." *Id.* Rather, courts must determine that existing precedent has rendered the right "beyond debate." *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 5, 142 S. Ct. 4, 8, 211 L.Ed.2d 164 (2021) (per curiam) (quoting *White v. Pauly*, 580 U.S. 73, 137 S. Ct. 548, 551, 196 L.Ed.2d 463 (2017) (per curiam)).

*Henderson v. Harris Cty.*, 51 F.4th 125, 132–33 (5th Cir. 2022).

The second way a plaintiff may demonstrate that a law is clearly established is with "the 'rare' possibility that, in an 'obvious case,' analogous case law 'is not needed' because 'the unlawfulness of the [challenged] conduct is sufficiently clear even though existing precedent does not address similar circumstances.'" *Joseph*, 981 F.3d at 330 (quoting *Wesby*, 138 S. Ct. at 590). "[I]n an obvious case, general standards can [therefore] 'clearly establish' the answer, even without a body of relevant case law." *Roque v. Harvel*, 993 F.3d 325, 335 (5th Cir. 2021). But "[t]he standard for obviousness is sky high[.]" *Joseph*, 981 F.3d at 337.

Whether a right is clearly established is typically a question of law, but there may be factual disputes which are relevant to the determination. *Cruz v. Cervantez*, 96 F.4th 806, 813 (5th Cir. 2024). But ultimately, to defeat an assertion of qualified immunity, the plaintiff "has the burden to point out clearly established law [and] rais[e] a fact issue as to its violation." *Tucker v. City of Shreveport*, 998 F.3d 165, 173 (5th Cir. 2021). Again, Noles has not filed a response to the Motion.

a. <u>A case or body of caselaw</u>

Pertaining to the "case or body of caselaw" path of demonstrating clearly established rights, the Court's "fair warning" inquiry should consider only published opinions issued before Noles's assignment to the gym floor on September 26, 2022. *Tolan*, 572 U.S. 650, 656 (2014) (the second prong of the qualified-immunity analysis asks whether the right in question was "clearly established" at the time of the violation); *Marks v. Hudson*, 933 F.3d 481, 486 (5th Cir. 2019) (because unpublished opinions are not precedential, they "do not establish any binding law for the circuit" and thus "cannot be the source of clearly established law for qualified immunity analysis").

To find that Noles raised a fact issue on whether his constitutional rights were violated required the undersigned to string together a varied combination of lesser-included fact issues about the individual conditions themselves, the length of time Noles was exposed to those conditions, and Noles's particular medical conditions. But it is the same complexity of how all these variables interact that preclude a finding that they violated clearly established law.

True, Noles is not required to marshal a case on point. And there are some cases which cite to the holding in *Burleson v. Texas Dept. of Criminal Justice* that "Burleson alleged a violation of a clearly established constitutional right: the Eighth Amendment right to be free from conditions of confinement which pose an unreasonable risk of damage to a prisoner's health." 277 F.3d 1374, *2 (2001). But the undersigned does not read *Burleson*, an unpublished decision, as establishing such a broad, general "clearly established right." Other conditions-of-confinement cases that might apply here similarly define that right at

24

too high a level of generality to conclude that those cases "squarely govern" this case. *Cope v. Cogdill*, 3 F.4th 198, 204–05 (5th Cir. 2021) (citing *Brosseau v. Haugen*, 543 U.S. 194, 201 (2004) (per curiam); *Mullenix*, 577 U.S. at 12 (emphasizing that "[t]he dispositive question is whether the violative nature of *particular* conduct is clearly established" (internal quotation marks and citation omitted))).

The authority that does exist is not sufficiently specific to put all reasonable officials on notice that Defendants' conduct was definitively unlawful. *Buehler v. Dear*, 27 F.4th 969, 981 (5th Cir. 2022). Nor has Noles pointed to a body of law that would put the unconstitutionality of these combined conditions "beyond debate." *Ashcroft*, 563 U.S. at 741. Reasonable minds could make arguments either way. Therefore, even though the undersigned finds that Noles has created factual disputes regarding whether Defendants violated his right to safe and sanitary living conditions, there was no clearly established body of law at the time that would have put every reasonable officer on notice that this complex set of circumstances definitively violated that right.

### b.  Obvious exception

The facts here also do not meet the "obvious" exception. *Taylor* and *Pelzer* involved circumstances so egregious that any reasonable officer would have known they violated the Constitution. In *Taylor*, prison officials confined an inmate for six full days in two "shockingly unsanitary cells"—one covered nearly floor to ceiling in massive amounts of feces, and the other frigidly cold with urine on the floor where the inmate was required to sleep naked. 592 U.S. at 7–8. In *Pelzer*, an inmate was restrained to a hitching post for seven hours without bathroom breaks as punishment, forced to remove his shirt so the sun

25

would burn his skin, and taunted with water given first to the dogs and then spilled on the ground. 536 U.S. at 734–35.

Noles may have been forced to endure the conditions here for a significantly longer period of time. And it has been suggested that the need for granularity with the "clearly established" prong may be more leniently applied where "the correctional officers had plenty of time to assess their horrific conduct and recognize that it obviously violated the law." *Villarreal*, 134 F.4th at 282 (Oldham, J., concurring). Judge Oldham explained that with the egregious facts of *Taylor*, "it was of no moment that precedent had only clearly established a general prohibition on 'inhumane' conditions of confinement", especially in light of no "exigency". *Id.* (citing *Farmer*, 511 U.S. 832). That said, Judge Oldham observed at the same time, "the Court had apparently 'never—until Taylor—actually used' the obviousness standard 'to decide a case.'" *Id*. fn 6 (citing Comment, *Taylor v. Riojas*, 135 HARV. L. REV. 421, 429 (2021)).

The standard for holding Defendants liable based on "obviousness," rather than clearly established law, is exceptionally high. *Joseph*, 981 F.3d at 337. Although the conditions here were deplorable, they do not rise to the level of deplorability in *Taylor* or *Pelzer*.

Noles can show genuine issues of material fact as to the first prong analysis—a constitutional violation—but not as to the second prong analysis—clearly established. Therefore, Defendants are entitled to qualified immunity.[6]

---

[6] In Noles's complaint, he seeks punitive damages and states that "[n]ot all punitive damage awards require physical assault." Dkt. No. 1 at 4, 6. Defendants' Motion spends a lot of time refuting the existence of a

## V.  CONCLUSION

The facts, when viewed in the light most favorable to Noles, would permit a reasonable jury to find that Noles was objectively exposed to a substantial risk of serious harm and that Defendants were subjectively indifferent to that risk. But the Court should conclude that Noles's right to be free from the objectively serious conditions was not clearly established at the time. Accordingly, the undersigned RECOMMENDS that the Court GRANT Defendant Akwitti and McCain's Motion for Summary Judgment on Qualified Immunity.

## VI.  RIGHT TO OBJECT

A copy of these Findings, Conclusions, and Recommendations shall be served on all parties in the manner provided by law. Any party who objects to any part of these Findings, Conclusions, and Recommendations must file specific written objections within fourteen days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). To be specific, an objection must identify the specific finding or recommendation to which the objection is made, state the basis for the objection, and specify the place in the magistrate judge's Findings, Conclusions, and Recommendations where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions

---

compensable injury under the PLRA. Dkt. No. 38 at 9–10, 15–19, 22–23. Because Defendants are entitled to qualified immunity, they are immune from suit, and this case should be dismissed. Noles's injury, if any, is irrelevant.

of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

### VII. CASE TRANSFER

Having completed the preliminary screening of Noles's claims, the undersigned ORDERS that this case be TRANSFERRED back to the docket of the United States District Judge and designated as Civil Action Number No. 1:22-CV-00198-H.

ORDERED this 27th day of January 2026.

_____

JOHN R. PARKER
UNITED STATES MAGISTRATE JUDGE

28